# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MICHAEL HENLEY,                                :
        Plaintiff,                            :
                              :
        v.                                  :       C.A. No. 14-332M
                              :
CAROLYN W. COLVIN, ACTING           :
COMMISSIONER OF SOCIAL SECURITY,    :
        Defendant.                          :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

With the achievement of sobriety after years of substance abuse, regular treatment with a psychiatrist and relatively better compliance with his psychiatric medication regime, Plaintiff Michael Henley's mental health has stabilized; nevertheless, he remains isolated in his home, burdened by chronic depression, nightmares, paranoia, occasional suicidality, poor coping skills and flares of anger triggered by what he perceives as frustration or disappointment. This matter is before the Court on his motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the Administrative Law Judge ("ALJ") committed reversible error by giving inadequate weight to the opinion his longtime treating psychiatrist, Dr. Ruth Stemp. Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that the ALJ's decision is tainted by error and that her findings are not supported by substantial evidence.

Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be GRANTED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 12) be DENIED. I further recommend that the matter be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation pursuant to Sentence Four of 42 U.S.C. § 405(g), and final judgment should enter in favor of Plaintiff.

## I.    __Background Facts__

These applications for DIB and SSI are Plaintiff's second set; on January 5, 2009, he applied alleging disability based on depression and right knee and shoulder problems. Tr. 74. On May 18, 2011, an ALJ found that, although his mental impairments met the criteria for two Listings, he was not disabled under the Act based on the materiality of substance abuse. Tr. 84. The current applications were filed on May 31, 2011, alleging disability beginning the day following the first denial based on depression, glaucoma and problems with his right knee and right shoulder. Tr. 237, 241. By contrast with the first applications, the medical record for the second set establishes that Plaintiff had achieved sobriety prior to the alleged disability onset date (May 19, 2011) so that substance abuse is no longer a material contributor. Tr. 115, 131.

A high school graduate who completed one year of college, Tr. 241, Plaintiff was forty-four years old on the date of onset of the current period of disability. Tr. 208. Prior to 2007, he had worked for telemarketing firms and as an order picker; he was promoted to manager in the last years that he worked, with responsibility for hiring and firing. Tr. 49, 241-42. Until her death in late 2004, he lived with his wife and cared for his children from a prior marriage. His wife's death from cancer had a devastating emotional impact on Plaintiff; "when my wife died, my whole foundation broke down. I lost everything in that." Tr. 56. Within less than two years,

he had stopped working, placed his children in the care of his own mother, lived alone and was engaged in serious substance abuse, although the prior record also suggests that the drug abuse was longstanding and that Plaintiff may have stopped work because of an on-the-job charge of embezzlement. Tr. 55, 78, 81. By 2011, he had stopped using illegal substances, relying instead on prescribed medication to control his symptoms of hearing voices, suicidal ideation, depressed mood, anxiety and anger, but still living an isolated life with persistent depression and anxiety, punctuated by feelings of anger towards other people and occasional suicidality. Tr. 314, 319. The record reflects that his mental status fluctuated; when he was feeling better, he enjoyed interacting with his children and saw his mother, but he also experienced periods of anger and seriously depressed mood when faced with disappointment. Tr. 314. For example, after he learned of the denial of his SSI/DIB applications in May 2011, he was consumed with disappointment and anger. At a therapy appointment a month later, he admitted to suicidal thoughts, bolted from the Providence Center where he had gone for treatment and required several days of active monitoring before his therapist opined that he was beginning to feel better and would contract not to harm himself. Tr. 318-22.

Throughout the period of alleged disability, Plaintiff regularly received mental health treatment from his psychiatrist, Dr. Ruth Stemp, at the Providence Center, as well as counseling (until he became angry with her and stopped coming) from a Providence Center therapist, Courtney Bedard. In his own words, he explained why he cannot work:

> Because I get a little – I get really antsy. I get upset when things don't go my way . . . I get really worked up sometimes. I mean, before I was manager and would just get, like, really worked up with the coworkers and I'd probably get into a frenzy state and, like, need to calm down.

Tr. 47-48. Despite these struggles, the record also establishes that Plaintiff is able to use public transportation, make simple meals, shop for food and had never been fired because of his

inability to get along with other people. Tr. 50-51, 262-65. Moreover, while Plaintiff testified to repeated altercations with other tenants in his building during the period of alleged disability and with coworkers while he was employed, Tr. 61 ("The people – I hate them"), the record has no reference to any legal difficulties resulting from these episodes.

The current applications allege disability based on depression, as well as right knee and shoulder pain and glaucoma. For this appeal, Plaintiff has abandoned his somatic impairments, alleging only that the ALJ erred in rejecting his claim based on his mental health impairments.

### A. Relevant Medical History

Plaintiff's treating relationship with his psychiatrist, Dr. Stemp, and her team at the Providence Center began well before the alleged date of onset with respect to these applications. In connection with this treatment, Dr. Stemp, together with the other providers on the team, regularly (as reflected in the record, approximately every six months) updated Plaintiff's treatment plan; the earliest post-onset plan, dated July 2011, reflects diagnoses of bipolar disorder NOS, major depressive disorder, recurrent episode moderate, post-traumatic stress disorder ("PTSD") and cocaine abuse. Dr. Stemp consistently assessed Plaintiff's GAF score as 50,[1] Tr. 327, 356, 365, and noted that barriers to recovery include his inconsistency in attending appointments and difficulty in controlling anger, but that strengths include intelligence, independence and sense of humor when he is feeling better. Tr. 327. The plan recommends

---

[1] A Global Assessment of Functioning ("GAF") score of 50 indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM–13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited July 17, 2015).

continued counselling at least monthly and more often if needed, continued treatment with Dr.

Stemp (as reflected in the record, every other month and as needed), and continued treatment

with an array of prescribed medications.  See Tr. 328.  Although psychiatric hospitalization was

actively considered during the period of disability, Tr. 319, 325, Plaintiff was never hospitalized.

The relevant treating history begins on March 21, 2011, two months prior to onset, when

Plaintiff saw his therapist, Ms. Bedard, and told her that he had missed his last appointment due

to depression and feelings of "going downhill," after running out of medication and getting it

from friends; she noted, "[c]lient seems to go through periods where he isolates, does not reach

out for help with meds, etc. does not attend appointments and is noncompliant with meds."  Tr.

344-45.  Plaintiff saw Dr. Stemp the next day; she found him anxious, depressed, slightly

irritable and guarded, though there were no delusions or suicidal or homicidal ideation.  Tr. 312.

At the April appointment with Dr. Stemp, Plaintiff was taking his medication as directed; while

he remained isolated and his hygiene was only fair, his mood was improved, "more stable, fewer

and less intense up and down," and he was visiting family "a lot."  Tr. 314.  Plaintiff denied

suicidal ideation and hallucinations.  Id.

On June 24, 2011, Plaintiff appeared for an appointment with Ms. Bedard, still reacting to

learning of the denial of SSI benefits over a month before.  Tr. 318.  He refused to talk except to

express disappointment, anger and hopelessness: "he feels so bad, at least he felt better when he

was using [drugs]."  Tr. 318.  More importantly, he reported recent suicidal ideation and refused

to contract for safety – in speaking of his suicidal thoughts, he told the therapist that, "with his

luck, he would end up jumping off a bridge and becoming a paraplegic and stuck in a wheel

chair."  Tr. 318-19.  Ms. Bedard walked him to Dr. Stemp's office, but when Plaintiff heard them

speaking of sending him to the hospital, he ran.  Tr. 319.  Concerned about his safety, Ms.

Bedard repeatedly called him, as well as the manager of his apartment building to arrange for a police wellness check, to no avail. According to Dr. Stemp, for several days, the Providence Center was concerned that he "[m]ay pose a suicide risk as he would not contract for safety." Tr. 320. After three days of calling, resulting in brief conversations, Ms. Bedard noted that Plaintiff had stayed with an aunt and was then with his mother; by the end of the weekend, Ms. Bedard observed that his mood had become more stable. Tr. 322-24.

At his next appointment, on July 12, 2011, Ms. Bedard found Plaintiff's affect constricted, his mood depressed and irritable, and his speech pressured; although he denied current suicidal ideation, she noted that, "he continues to struggle with this." Tr. 325. She reviewed his pre-crisis plan, including how to reach out to staff or to the hospital if he needed help. Id. She found his anger reduced and he is "always 'up and down' but feels more up right now than down." Tr. 326. Two weeks later, Ms. Bedard made essentially the same findings on examination, except that by this appointment, Plaintiff's speech had become appropriate. Tr. 329. Her notes reflect that he described nightmares about the three times that he was stabbed, his ongoing anger, sadness, frustration and constant struggle with "up and down moods." Id.

At the August 5, 2011, appointment with Dr. Stemp, Plaintiff reported that he was taking his medication as directed with a minor exception; he denied side effects. Tr. 331. He told her that he "mostly stays inside his apartment . . . does his housework and talks to his Mom sometimes, otherwise is isolative." Tr. 331. On examination, Dr. Stemp observed that he was guarded and minimally talkative, his mood was depressed and anxious, though his thoughts were organized, and he denied delusions, hallucinations and suicidal ideation. Id. As "Assessment Additional Information," she wrote, "chronic anxiety, depression, erratic sleep, poor coping skills." Id. Two weeks later, Ms. Bedard's encounter was a "good day;" he was chatty,

reminisced about working, agreed that he needs structure and expressed the desire to look at educational opportunities.  Tr. 332.

In September 2011, Plaintiff told Dr. Stemp that he was taking his medications as directed, but that bed bugs in his building were causing him "a lot of stress," that he does not like his building and the people there and that stress is adversely affecting his sleep.  Tr. 351.  On examination, Dr. Stemp observed that Plaintiff was feeling a "global sense of paranoia about others," and was very anxious with dysphoric and slightly irritable mood, although his thoughts were organized, he denied hearing voices, suicidal ideation and hallucinations and said he felt good on his current medication.  Id.  Dr. Stemp opined that his increased blood pressure was linked to anxiety and stress.  Id.  However, in October, Dr. Stemp received test results indicating that Plaintiff's Depakote levels were not detectable; concerned, she tried several times to reach him by phone to ask whether he was taking that medication.  Tr. 352.  When he appeared for an appointment with Ms. Bedard in November 2011, he talked to her about housing and she suggested he might need a case manager to help him.  Tr. 354.  She noted, "client is stable right now, very frustrated but seems to be managing his emotions.  However, staff is always concerned that client will become overwhelmed by stress as he has a history of [suicidal ideation] and severe depression."  Tr. 355.  Also in November, Plaintiff's treatment plan was updated; his diagnoses were listed as bipolar disorder NOS, PTSD and cocaine abuse with a GAF score of 50.  Tr. 356.  The plan noted that no family members are involved in his treatment and that his problems included difficulties with both his primary support group and with his social environment and ongoing issues with anger and grief.  Tr. 355-56.

As reflected in the record, Plaintiff's last appointment with Ms. Bedard was on December 1, 2011.  Tr. 360-61.  When she tried to check on his mood, he did not talk too much.  Tr. 361.

She noted, "[b]aseline depressed and frustrated," but also that he wanted to find out about courses he could take for part-time work. Tr. 361. Not reflected in these notes, but described by Plaintiff at the hearing, Tr. 51-53, was an incident during which he became "really frustrated and . . . mad" with Ms. Bedard because he perceived she was not doing things he wanted her to do; he refused to continue to see her. As a result, in the next treatment plan, Plaintiff was shifted to "MD only status." Tr. 365-66.

At his February 2012, appointment with Dr. Stemp, Plaintiff reported that he had been largely compliant in taking medication, though he also described "chronic long standing moodiness and discomfort around others . . . he does not like people," as well as "chronic distrust and fear of others." Tr. 362. He said that he spent his time going for walks and visiting with his mother or son. Id. On examination, Dr. Stemp observed that his hygiene was fair and his baseline was anxious, dysphoric and irritable; she observed that his thoughts were organized, his speech was not rapid or pressured and he was not experiencing any delusions, suicidal ideation or hallucinations. Id. She noted that his "chronic long standing symptoms continue at baseline level" and urged him to work with his therapist on increasing daily structure. Id.

In April 2012, Plaintiff told Dr. Stemp that he had stopped Lexapro for a week because it was making him vomit, though he was taking all other medications, and that his best friend had died three days before; she found him more depressed and irritable, very sad, "[r]eport[ing] chronic dislike of people and stays mostly in his room," although he enjoyed a recent visit with his children. Tr. 364. Two months later, Plaintiff stated that he had run out of Lexapro the previous month; although he was compliant with other medications, his moods had been up and down and he was more irritable and anxious. Tr. 369. During the appointment, he said "he mostly stays in his apartment and isolates as he has trouble being around other people." Id. Dr.

Stemp noted that Plaintiff initially was very angry with loud, rapid and pressured speech because his appointments had been changed; he became calmer as the appointment continued. Id. During the last treating encounter in the record, on July 26, 2012, Dr. Stemp noted anxiety due to his son's mental health issues and Plaintiff's report that "he mostly stays to himself." Tr. 370.

### B. Opinion Evidence

On June 17, 2011, state agency reviewing psychologist JoAnne Coyle, Ph.D., reviewed Plaintiff's records as of that date and completed a Mental Residual Functional Capacity ("RFC")[2] assessment. Tr. 102-05. She opined that, even with medication, Plaintiff suffers from severe affective and anxiety disorders resulting in moderate restrictions, causing one or two episodes of decompensation, and that his severe limitations appear to be independent of substance abuse, which appeared to be in remission. Id. In her RFC, she opined that Plaintiff's ability to maintain attention and concentration, to work in the vicinity of others, to carry out detailed instructions and to complete a normal workday are moderately limited. Tr. 117. She found moderate limitations in his ability to interact with supervisors, coworkers or the public, and to maintain appropriate behavior and dress and that he could adapt only to minor changes in routine. Tr. 118.

Dr. Stemp signed her treating source opinion on August 23, 2011. Tr. 335. In it, she agreed with the state agency opinion with respect to the lack of materiality of substance abuse. She opined that Plaintiff suffers from recurrent major depression, bipolar disorder and PTSD, causing an array of disabling impairments: "chronic severe paranoia, depression, volatility, low stress tolerance, poor coping skill, suicidal thoughts, anger attacks, mood instability." Tr. 337. Her RFC assessed severe limits in his ability to relate to other people including supervisors and

---

[2] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

coworkers, and to respond to customary work pressures, including with respect to the ability to perform even simple tasks. Tr. 335-36. Based on these findings, she concluded that Plaintiff would be unable to work full time. Tr. 337.

A second state agency reviewing psychologist, J. Stephen Clifford, Ph.D., agreed with the moderate limitations set out in Dr. Coyle's opinion; his mental RFC assessment was signed on October 5, 2011. Tr. 132-34.

## II.   <u>Travel of the Case</u>

Plaintiff filed his applications for DIB and SSI on May 31, 2011, alleging that he became disabled on May 19, 2011. Tr. 208-09, 212-20. Plaintiff's applications were denied initially, Tr. 153-56, and on reconsideration, Tr. 163-68, and he requested a hearing before an ALJ. Tr. 169. On October 3, 2012, the ALJ held a hearing at which Plaintiff, who was represented by counsel, and a vocational expert appeared and testified. Tr. 41-70. On October 15, 2012, the ALJ issued a decision finding that Plaintiff was not disabled from May 19, 2011, through the date of the decision. Tr. 23-36. The Appeals Council denied Plaintiff's request for review, Tr. 4-7, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed this action.

## III.   <u>The ALJ's Hearing and Decision</u>

At his October 3, 2012, hearing, Plaintiff testified about his difficulties with coworkers while he was working ("I'd probably get into a frenzy state"), with his therapist at the Providence Center ("it just got really frustrating"), and with other tenants in his building ("I hate them"). Tr. 48, 53, 61. He explained that he prefers to stay in the house and goes to see his mother only because she gets concerned and will come to check on him if he does not go to see her; his son lives with his mother because "I'm not well enough to take care of him." Tr. 54-55.

Plaintiff was candid that he did not have any difficulties with bathing or dressing, he can take the bus, prepare meals, do shopping and laundry and has a few friends, though he seldom visits them or goes anywhere with them. Tr. 50-51, 53, 54, 62. When asked how he gets along with other people, Plaintiff stated, "I try to avoid people the most I can. . . . I can put the mask on, but it's not me. It doesn't work. It doesn't work, because then the mask falls off, the mask melts, and then I just get angry." Tr. 61.

The ALJ issued her decision under the familiar five-step sequential evaluation process. At Step One, she found that Plaintiff had not engaged in substantial gainful activity since May 19, 2011, his alleged onset date. Tr. 28. At Steps Two and Three, the ALJ found that Plaintiff's major depressive disorder and post-traumatic stress disorder were severe impairments, but they did not meet or medically equal the requirements of the Listing of Impairments. Tr. 28-30. The ALJ's RFC determination was based on her conclusion that Plaintiff could perform a full range of work at all exertional levels, but with certain non-exertional limitations, including a moderate limitation in concentration, persistence and pace such that he could understand, remember and carry out simple tasks; and a moderate limitation in social interactions, limiting him to object-oriented tasks with only occasional work-related interactions with supervisors, coworkers and the general public. Tr. 31. At Step Four, the ALJ found that Plaintiff not only could perform his past relevant work but also that he could do other jobs, such as janitor, assembler or jewelry painter. Tr. 34-36. Accordingly, the ALJ concluded that Plaintiff was not disabled from May 19, 2011, through the date of her decision. Tr. 36.

## IV.    Issue Presented

Plaintiff's motion for reversal rests on one argument – that the ALJ gave inadequate weight to the opinion of Plaintiff's treating psychiatrist, Dr. Ruth Stemp.

V.    **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 404.1529(a).[3]

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but

also was insufficient for district court to find claimant disabled).  Where the Court cannot discern

the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow

an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir.

2001).  On remand under Sentence Four, the ALJ should review the case on a complete record,

including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)

(necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

---

[3] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and
SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I
cite only to the DIB regulations.  See id.

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[4] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate

---

[4] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.     The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. See 20 C.F.R. § 404.1520. First, if a claimant is working at a substantial gainful activity, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. 20 C.F.R. § 404.1520(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. Deblois, 686 F.2d at 79; 42 U.S.C. § 416(i)(3). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C. Evaluation of Mental Illness Claims

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four. See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July 2, 1996). The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas. 20 C.F.R. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2014).

### VII. Application and Analysis

Plaintiff challenges the ALJ's decision to afford limited probative weight to the opinion of his well-qualified treating psychiatrist – Dr. Stemp – who has had a longitudinal treating relationship with him, grounded in regular and substantial face-to-face appointments and phone contact, beginning prior to and continuing over the course of the entire period of disability. Importantly, the rejected opinion is consistent with Dr. Stemp's treating records, which reflect

objective medical findings made at each of the nine appointments reflected in the record. In her

opinion, Dr. Stemp recorded severe limitations in his ability to relate to other people and to

respond to customary work pressures, including the ability to perform even simple tasks,

compelling a determination of disability. The ALJ relied instead on two state agency

psychologists whose opinions were principally based on their review of Dr. Stemp's records, as

well as the more limited records of the treating therapist, Ms. Bedard. The agency psychologists

interpreted these treating records as establishing only moderate limitations in Plaintiff's ability to

relate to other people and to complete a normal workday, compelling a determination of no

disability. Plaintiff contends that the ALJ erred in rejecting the opinion of his treating

psychiatrist. The issue is wrinkled by the therapist, Ms. Bedard, who worked closely with and

under the supervision of Dr. Stemp, and whose notes are mostly consistent with those of Dr.

Stemp, but who never recorded an observation of one of the serious impairments (paranoia)

noted by Dr. Stemp.

      The starting point for the analysis is the applicable regulations, which set out the factors

to be utilized in evaluating the weight to be afforded to a treating source opinion. 20 C.F.R. §

404.1527(c). They are: (1) the "[l]ength of the treatment relationship and the frequency of

examination," 20 C.F.R. § 404.1527(c)(2)(i); (2) the "[n]ature and extent of the treatment

relationship," 20 C.F.R. § 404.1527(c)(2)(ii); (3) the supportability of the opinion, 20 C.F.R. §

404.1527(c)(3); (4) the consistency of the opinion "with the record as a whole," 20 C.F.R. §

404.1527(c)(4); (5) the specialization of the source, 20 C.F.R. § 404.1527(c)(5); and (6) "[o]ther

factors," 20 C.F.R. § 404.1527(c)(6). See Ferguson v. Colvin, 63 F. Supp. 3d 207, 211-12

(D.R.I. 2014). Additionally, Social Security Ruling ("SSR") 96–2p(6)'s Policy Interpretation

reminds adjudicators "that a finding that a treating source medical opinion . . . is inconsistent

with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." 1996 WL 374188, at *4 (July 2, 1996). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927." Id. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Id.; see Brown v. Colvin, No. CA 13-643-M, 2014 WL 4347057, at *4-5 (D.R.I. Aug. 29, 2014).

To shore up the ALJ's decision, the Commissioner points to authority holding that, when the treating physician's opinion is inconsistent with other evidence in the record, the conflict is to be resolved by the Commissioner and not the courts. Snow v. Barnhart, No. 05-11878, 2006 WL 3437400, at *7 (D. Mass. Nov. 29, 2006) (citing Rodriguez, 647 F.2d at 222). This begs the question; a mere scrap of inconsistent evidence is not enough to allow the ALJ to ignore what would otherwise be the controlling opinion of a treating physician. Bouvier v. Astrue, 923 F. Supp. 2d 336, 346-50 (D.R.I. 2013). As a long-time acceptable medical source with a medical specialty in the relevant discipline who relied on medically acceptable clinical techniques, Dr. Stemp's opinion is entitled to controlling weight as long as it is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Nevertheless, even with substantial inconsistent evidence, the regulations still require that a longtime treating source, particularly one with specialized expertise in the subject of her opinion, is generally entitled to "more weight" than the opinion of either a consulting psychologist or a non-acceptable medical source – treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of

individuals examinations, such as consultative examinations." 20 C.F.R. § 404.1527(c)(2); see

Polanco-Quinones v. Astrue, 477 F. App'x 745, 748 (1st Cir. 2012) (per curiam); Alcantara v.

Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) (per curiam).

The foundation for the ALJ's rejection of Dr. Stemp's opinion is the finding that it is "not

supported by or consistent with the evidence of record and treatment records." Tr. 33. In

drawing this conclusion, the ALJ began with her conclusion that Dr. Stemp's opinion reference

to "chronic severe paranoia" lacks record support. This is not accurate – for example, while the

ALJ correctly pointed out that Plaintiff described himself feeling only "a little paranoid," during

the same appointment, Dr. Stemp's mental status examination resulted in the observation that

Plaintiff was feeling a "global sense paranoia about others," while at the next appointment, she

observed, "chronic distrust and fears of others." Tr. 351, 362; see also Tr. 364 (Dr. Stemp

records observation of "chronic dislike of people and stays mostly in his room").

Next, the ALJ concluded that the record references to "no suicidal/homicidal ideation" at

most of his appointments clashes with Dr. Stemp's opinion that one of Plaintiff's impairments is

"suicidal thoughts." Tr. 337. This is also not accurate. For example, on June 24, 2011, Dr.

Stemp's notes state, "pt. very upset by not getting SSI, May pose a suicide risk as he would not

contract for safety with his therapist." Tr. 320. Ms. Bedard wrote about the same incident,

noting that "staff concerned that client is not safe." Tr. 319. The record reflects that Ms. Bedard

spent a weekend repeatedly trying to call Plaintiff to ensure his safety. Tr. 321-23. Even at an

appointment when Ms. Bedard assessed Plaintiff as "stable" and "in a better mood," she also

noted that, although "[n]o current SI, no plan no intent," yet "client says he continues to struggle

with this," and she went over his "pre crisis plan" including how to reach out to staff, emergency

services or the hospital if he "felt like he was in crisis. Tr. 325-26.

The ALJ also wrongly concluded that Dr. Stemp's opinion is inconsistent with record evidence in that, "[i]t was repeatedly stated . . . there were no significant abnormalities in mental status." Tr. 33. The basis for this assertion is unclear – Dr. Stemp performed mental status examinations at every face-to-face appointment and she recorded many abnormalities. For example, even during appointments when he was taking medication as directed, which seemed to control his extreme symptoms, she consistently made such observations as: "very anxious, mood dysphoric . . . [p]t. expressing global sense of paranoia about others," Tr. 351, "[h]ygiene is fair. Pt. is baseline guarded, minimally talkative. Mood is depressed. Pt. is anxious, slightly irritable." Tr. 331; see also Tr. 318 (Ms. Bedard records observations that Plaintiff is guarded, agitated, depressed, irritable with pressured speech).

Similarly, the ALJ incorrectly seized on an isolated instance when Ms. Bedard noted that Plaintiff's mood had improved, ignoring that his volatility – "good days and bad days" – was part of his illness and that such an improvement was followed at the very next appointment by Dr. Stemp's assessment that "Condition Worsened." Tr. 351. A similar error infects the ALJ's reliance on occasional record references to "stable" or "euthymic" – for example, Ms. Bedard used the term "stable"[5] to indicate that the crisis of active suicidality had passed, Tr. 324, 326, or that, while "very frustrated" and potentially "overwhelmed by stress," Plaintiff was managing his emotions. Tr. 355. The single observation of a "euthymic" mood was made at an appointment that Ms. Bedard noted as a "good day." Tr. 333; see Bouvier, 923 F. Supp. 2d at 350 (one comment in record is not "substantial evidence").

Of the ALJ's litany of reasons for affording "limited probative weight" to Dr. Stemp's opinion, the only one that survives scrutiny, in that it appears to be accurately grounded in the

---

[5] As this Court has noted, "'stable' is defined simply as 'Steady; not varying; resistant to change.'" Santa v. Astrue, 924 F. Supp. 2d 386, 390 n.1 (D.R.I. 2013).

record, is the discrepancy between Dr. Stemp's opinion that Plaintiff suffers from the disabling impairment of "chronic severe paranoia," Tr. 337, and the failure of the therapist, Ms. Bedard, to check off "paranoia" as an observation at the five appointments during which she recorded such observations. Tr. 325, 329, 332, 354, 360. The first step in determining whether this discrepancy is sufficient to justify the ALJ's decision to completely reject Dr. Stemp's opinion requires this Court to determine whether Ms. Bedard's notes constitute "substantial evidence" on this point. Given that this therapist is a non-acceptable medical source not qualified to diagnose the impairment of paranoia, towards whom Defendant expressed such distrust (one might say paranoia) that he refused to continue counseling with her, it seems an impermissible stretch, likely amounting to error, to find that Ms. Bedard's failure to check "paranoia" is substantial evidence that Plaintiff was not impaired by paranoia, in contradiction to Dr. Stemp's opinion. See Santa v. Astrue, 924 F. Supp. 2d 386, 391-92 (D.R.I. 2013) (ALJ's rejection of treating source opinions requires remand when decision does not demonstrate that inconsistent evidence was substantial); Bouvier, 923 F. Supp. 2d at 347-50 (error not to give controlling weight to treating source opinion without finding that inconsistent evidence was substantial; record reference that claimant doing "well" is not substantial inconsistent evidence).

However, it is not necessary to wrangle with whether Ms. Bedard's failure to record observations of paranoia amounts to "substantial evidence." Even if this Court were to assume that it is "substantial evidence," the ALJ's reliance on it as the sole basis for rejecting Dr. Stemp and relying instead on the agency psychologists is a leap of reasoning that ignores the analytical framework mandated by SSR 96-2p, which makes clear that, even with substantial inconsistent evidence, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors" and that, "[i]n many cases, a treating source's medical opinion will be

entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." 1996 WL 374188, at *4. At bottom, the ALJ's failure to perform this analysis requires that this matter be remanded for further consideration.

In sum, Dr. Stemp recorded Plaintiff's isolative behavior due to his dislike and distrust of others; she observed Plaintiff during an episode of overt suicidality; she noted his inability to regulate his emotions when exposed to stress; she referred frequently to the chronic nature of his condition, including the lack of further improvement even when he was in compliance with treatment protocols and his substance abuse was in remission. Presented with such a treating opinion, from an acceptable medical source, well supported by clinical diagnostic techniques and observations and in sync with treating notes, I am constrained to find that the ALJ erred in affording it "limited probative weight." Tr. 33. Accordingly, I recommend that this Court remand the matter for a do-over on the weight to be afforded to Dr. Stemp's opinion.

**VIII.** <u>Conclusion</u>

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be GRANTED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 12) be DENIED. The matter should be REMANDED to the Commissioner for further proceedings consistent with this report and recommendation pursuant to Sentence Four of 42 U.S.C. § 405(g), and final judgment should enter in favor of Plaintiff. Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's

decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart,

Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 22, 2015